UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                     Case No. 05-CR-266

CARTELL A. MCLEMORE,

      Defendant.

**RECOMMENDATION RE: DEFENDANT'S MOTION TO SUPPRESS**

**I. PROCEDURAL BACKGROUND**

On December 17, 2003, a grand jury sitting in the Eastern District of Wisconsin returned a three-count indictment against defendant Cartell A. McLemore ("McLemore"). Count One charges McLemore with possession of 50 grams or more of cocaine base with intent to distribute the same, all in violation of Title 21 U.S.C. § 841(a)(1), 841(b)(1)(A) and Title 18 U.S.C. § 2. Count Two charges McLemore with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), the possession of such firearm having allegedly occurred on or about June 16, 2005. Count Three charges McLemore with possession of ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). McLemore has entered a plea of not guilty to all counts. His trial is currently scheduled to commence on April 12, 2006, before Chief United States District Judge Rudolph T. Randa.

In accordance with the pretrial briefing schedule issued in this matter, on November 30, 2005, McLemore filed a motion to suppress physical evidence. Specifically, McLemore moves the court to suppress:

> any and all physical evidence recovered by City of Wauwatosa police officers during a warrantless, nonconsensual, and pretextual search of his residence located at 2284 North 83rd Street, Apartment 4, Wauwatosa, Wisconsin, on June 16, 2005, including but not limited to the physical evidence recovered from the southwest bedroom: (a) a black Intratec, Model AB-10, 9mm handgun (serial number A008299); (b) a clear plastic baggy containing numerous "gem bags"; (c) a torn white transparent bag which contained three boxes of ammunition; (d) a shoe box containing 21 individually packaged corner cuts of suspected crack cocaine, a digital scale, and approximately $2,880.00 in United States currency.

(Def's Mot. at 1.) Because the issues raised by the defendant seemed to involve factual disputes, on January 3, 2006, an evidentiary hearing was conducted with respect to the defendant's motion to suppress. Thereafter, the parties filed briefs in support of their respective positions on the issues raised by the defendant. Consequently, the defendant's motion to suppress in now fully briefed and is ready for resolution. For the reasons which follow, it is recommended that the defendant's motion to suppress physical evidence be denied.

## II. FACTUAL BACKGROUND

Two witnesses testified at the evidentiary hearing: City of Wauwatosa Police Officer John Milotzky and City of Wauwatosa Police Officer Michael McDermott. The following is a brief summary of the testimony offered at the evidentiary hearing conducted by the court on January 3, 2006.

### A. Officer John Milotzky

John Milotzky ("Milotzky") testified that he is a police officer with the City of Wauwatosa and has been a law enforcement officer for approximately five years. On June 15, 2005, Milotzky

2

received information that pursuant to a homicide investigation, the Milwaukee police sought information regarding the residence located at 2284 North 83rd St, and the individuals residing at that address: Takiesha Haynes ("Haynes") and McLemore. Milotzky also received information that both Haynes and McLemore had outstanding warrants and Milotzky independently confirmed that the warrants were valid by running a warrants check on both individuals. McLemore's outstanding warrant was a traffic warrant and Haynes's outstanding warrant was a municipal warrant for retail theft. (Tr. at 8.) Milotzky also received information regarding a Chevrolet that was associated with Haynes and McLemore. (Tr. at 34.) Milotzky then ran criminal histories on both Haynes and McLemore, which revealed that McLemore had been convicted of possession with intent to deliver marijuana and was a felon. (Tr. at 8-9.)

At approximately 11:15 p.m. on June 15, 2005, Milotzky and his partner, John McDermott ("McDermott") went to the aforementioned address to determine whether either Haynes or McLemore was home. As Milotzky and McDermott drove by the apartment building, they noticed a blue Chevy Impala parked on 83rd Street just south of the alley that is directly adjacent to the apartment building. (Tr. at 10-11.) The officers ran a license plate check on the blue Chevy Impala, which revealed that the car was registered to McLemore. After learning that the vehicle was McLemore's, Milotzky and McDermott requested additional officers to arrive on the scene. After the additional officers arrived, Milotzky and McDermott approached the front door of the apartment building, rang one of the doorbells, and one of the residents let the officers in. The officers were dressed in plain clothes, but were wearing police raid-type ballistic vests and also had their police badges hanging from chains around their necks. When one of the residents, not Haynes or McLemore, answered the door, the officers identified themselves as police officers and the resident

let the police inside the lobby of the building. Once inside the lobby of the building, Milotzky noticed that the mailbox for apartment number four was labeled "Haynes and McLemore." (Tr. at 14.)

Milotzky and McDermott then proceeded upstairs to apartment number four, Milotzky knocked on the door, and a woman who identified herself as Takiesha Haynes answered the door. Once Milotzky and McDermott made contact with Haynes, they radioed for the backup officers to proceed up to apartment four. Milotzky then asked Haynes if he and McDermott could come inside the apartment to speak with her about her outstanding municipal warrant. Haynes allowed Milotzky and McDermott to enter the apartment and immediately upon entering the apartment, the officers were situated in the living room of the apartment. Once inside the living room, the officers placed Haynes under arrest and Milotzky placed handcuffs on Haynes. (Tr. at 16.) Milotzky then began giving verbal commands for anyone else in the apartment to come out with their hands showing. No one responded. Because of the lack of furniture in the living room, Milotzky determined that no one was in the living room besides the officers and Haynes.

Milotzky, McDermott, and one of the backup officers then conducted a "protective sweep" of the apartment. First, Milotzky and McDermott went to the southwest bedroom. There was not much furniture in the southwest bedroom. There was a chair in one corner and there was a large pile of laundry in another corner of the southwest bedroom. (Tr. at 19.) As the officers entered the room, McDermott went off to the left to check the closet and Milotzky went straight ahead. Once inside the room, Milotzky observed what he believed to be the grip of a handgun on the floor. When Milotzky observed what he believed to be a grip of a handgun, he indicated to McDermott that a

4

firearm was present. (Tr. at 20.) The officers were in the southwest bedroom for approximately twenty seconds. (Tr. at 20.)

The officers then quickly checked the bathroom, that is, ducked in and out, and then proceeded to the southeast bedroom. The southeast bedroom had more furnishings and the officers were in the southeast bedroom for approximately thirty to forty seconds. After exiting the southeast bedroom, Milotzky and McDermott spoke with the two backup officers to ensure that each room in the apartment was checked. (Tr. at 22.) One of the backup officers had gone to the kitchen to check that area and at some point during the sweep he had relayed to McDermott and Milotzky that no one had been located in the kitchen area. (Tr. at 78.) The entire sweep of the apartment took no longer than a couple minutes.

On cross-examination, Milotzky testified that prior to entering the southwest bedroom, or any other area of the apartment, Milotzky did not hear anything that would lead him to believe that someone else was inside the apartment. (Tr. at 23.) Milotzky also testified that he did not ring the doorbell to apartment number four, where he was informed Haynes and McLemore lived, because in his experience if a police officer rings the doorbell of the person with whom he wants to speak, that person will not answer the door. (Tr. at 30.) Milotzky also testified that the reason why he did not place Haynes under arrest and handcuff her at the door was because it is common practice, when he and his partner go to a door, be it a residence, an apartment, hotel, and it involves a warrant, to speak with the individual and try to conduct that business inside of the dwelling, rather than outside in the doorway area. (Tr. at 47.)

When Milotzky received the information regarding Haynes and McLemore, he did not receive any information as to what Haynes or McLemore's suspected relationship was to the homicide

5

investigation. (Tr. at 34.) However, Milotzky testified that he assumed Haynes and McLemore were suspects in the Milwaukee police department's homicide investigation. (Tr. at 40.)

After the officers ran the criminal history checks and confirmed the warrants, their plan of action was to go to the apartment and determine if either Haynes or McLemore was there and if so, the officers were going to arrest them on the outstanding warrants. (Tr. at 35.)

With regard to the pile of laundry located in the southwest bedroom, Milotzky also testified that he believed that it was possible for somebody to conceal themselves with the pile of laundry. (Tr. at 44.) The pile of laundry was approximately three feet high and two feet wide. (Tr. at 43.)

With regard to the grip of the handgun Milotzky observed, the grip was on the floor in between the chair and the pile of laundry, and there was a black towel covering part of the firearm. (Tr. at 48.) The clear plastic baggie containing numerous gem bags was found next to the firearm underneath the towel. (Tr. at 49.) That is, when Milotzky returned to the southwest bedroom to recover the firearm, he picked up the black towel and underneath the black towel was the plastic baggie containing the numerous gem bags. (Tr. at 49.) The torn white transparent bag which contained three boxes of ammunition was located within a foot or two of the firearm. (Tr. at 50.) Milotzky did not observe the white transparent bag which contained ammunition when he was in the southwest bedroom conducting his sweep, however, he did notice it when he went back to the southwest bedroom to recover the firearm. (Tr. at 50.)

After Milotzky and McDermott conducted the sweep, Milotzky went back to the southwest bedroom to recover the firearm and at that time, McDermott advised him that he had also located evidence, "drugs and money," in the closet. (Tr. at 52.) While Milotzky was retrieving the firearm, McDermott went to the closet and brought out a shoe box that contained the suspected crack cocaine

6

and currency. The top of the shoe box was open. (Tr. at 53.) Milotzky could see numerous small corner cut baggies of what appeared to be crack cocaine, a digital scale, a stack of U.S. currency, and some slips of paper in the shoe box. (Tr. at 53.)

### B. Michael McDermott

Michael McDermott ("McDermott") testified that he is a police officer with the City of Wauwatosa and has been a Wauwatosa police officer for six and a half years. McDermott's testimony, in large part, corroborated Milotzky's testimony. McDermott also testified that when the officers entered the apartment building, he did not see the names Haynes and McLemore on the mailbox in the front lobby of the apartment building. (Tr. at 68.) While the officers were talking to Haynes at the doorway, McDermott testified that he advised Haynes that she was under arrest and then asked her if he and Milotzky could come into the apartment to discuss her options on the warrant. (Tr. at 69.) McDermott testified that during this conversation at the doorway Haynes was very cooperative and polite. (Tr. at 70.)

Furthermore, McDermott testified that when the officers entered the southwest bedroom, the bowl shaped chair was straight ahead of the officers. (Tr. at 73.) The bowl shaped chair is the type of furniture that someone could conceivably hide behind. (Tr. at 73-74.) Upon entering the southwest bedroom, McDermott headed to his left toward the closet. The closet was not a walk-in type closet and was approximately two and a half feet deep and approximately four or five feet wide. (Tr. at 85.) When McDermott opened the closet door, he shoved the shirts hanging on the rack as hard as he could hoping to stun someone who might have been hiding in there. (Tr. at 76.) Then McDermott either looked down or accidentally kicked the shoe box and then looked down, and saw

7

an open shoe box on the floor. (Tr. at 76.) The shoe box contained a large amount of money, what appeared to be crack or cocaine tied in clear plastic baggies, and a digital scale. (Tr. at 76.)

On cross-examination McDermott testified that he did not have personal contact with anyone from the Milwaukee Police Department when he received the information regarding Haynes and McLemore. (Tr. at 79.) Nor does McDermott recall whether he said anything to Milotzky when he discovered the shoe box when the officers were initially in the southwest bedroom. (Tr. at 87.) McDermott further testified that he and Milotzky did not place Haynes in handcuffs at the doorway because it is their practice to enter the apartment and talk to the suspect about an arrest warrant rather than arresting somebody in a common area and pulling them right out the door. (Tr. at 95-96.)

### III. ANALYSIS

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that: "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. A protective sweep is permissible under the Fourth Amendment "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the area swept harbored an individual posing a danger to the officers or others." *Id.* (citation and internal quotations omitted).

In *Buie*, the Court made clear that the "protective sweep" exception is grounded upon the Fourth Amendment's core requirement that such intrusions into the privacy of individuals be reasonable. Thus, the justification for the "protective sweep" is grounded in traditional Fourth Amendment jurisprudence, and individual applications of the exception must be evaluated in terms

8

of their reasonableness. This is because "'[t]he Fourth Amendment bars only unreasonable searches and seizures.'" *United States v. Burrows*, 48 F.3d 1011, 1015 (7th Cir. 1995) (quoting *Buie*, 494 U.S. at 331).

The Court, in *Buie*, speaks to two circumstances in which a protective sweep is permissible under the Fourth Amendment. The first circumstance is a purely precautionary sweep dictated by the geography of the arrest location. Here, officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in . . . spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. The second circumstance contemplates a sweep beyond those parameters when there are "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Leaf v. Shelnutt*, 400 F.3d 1070, 1086 (7th Cir. 2005) (quoting *Buie*, 494 U.S. at 334). Comparing a "protective sweep" to a stop under *Terry*, or a search of the passenger compartment of an automobile under *Long*, the Supreme Court held:

> A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Buie*, 494 U.S. at 333.

Simply stated, the particular facts presented in each case determine whether the protective sweep in question complies with the principles of *Buie*. As the Court of Appeals for the Seventh Circuit held in *Burrows*:

*Buie* makes clear that the "Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." As our cases applying the guidance of *Buie* make clear, the inquiry is necessarily a very fact-specific one and requires that the circumstances of the particular encounter be assessed carefully in light of the overarching policy concerns articulated in *Buie* and its first cousins, *Terry* and *Long*. In each instance, the particular configuration of the dwelling and the characteristics of those known to be present and who might be present must be the primary focus of the officers' assessment. Moreover, although never adequate standing alone to justify a sweep, the general surroundings, especially its history and previous law enforcement efforts, must enter into the calculus. This latter estimation must be based on actual historical facts, not stereotypes.

48 F.3d. at 1016 (citation omitted).

In the end, as the court in *Burrows* acknowledged:

Protective sweeps, as *Buie* recognizes, are a necessary fact of life in the violent society in which our law enforcement officers must perform the duties of their office. We must also recognize, however, that the sweep is a device that can easily be perverted to achieve ends other than those acknowledged as legitimate in *Buie*. Given the fact-intensive nature of the inquiry and the resulting deferential standard of appellate review, the Constitution depends in large measure on the magistrate judges and the district judges to preserve the balance required by the Fourth Amendment. Their careful, detached and demanding scrutiny is, realistically, the most effective weapon we have against the erosion of the Fourth Amendment.

*Id.* at 1017-18.

Turning to the facts of this case, the court recognizes that Milotzky and McDermott's testimony differ regarding the location where Haynes was arrested, that is, whether she was arrested at the doorway of the apartment or whether she was arrested in the living room of the apartment. Thus, the court will address the constitutionality of the protective sweep under each scenario, addressing the latter scenario first.

Assuming Haynes was arrested in the living room of the apartment, the protective sweep performed by Milotzky and McDermott was permissible under the Fourth Amendment. Moments

before Milotzky and McDermott commenced their protective sweep of the apartment, Haynes was placed under arrest and placed in handcuffs in the living room of the apartment. (Tr. at 16.) To be sure, this in-home arrest "put[] the officer[s] at the disadvantage of being on [their] adversary's 'turf,'" as the arrest occurred in a "confined setting of unknown configuration." *Buie*, 494 U.S. at 333. As the Supreme Court stated in *Buie*, it is permissible for officers to "as a precautionary matter and without probable cause or reasonable suspicion, look in . . . spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Such is the case here. The officers testified that the apartment was a small two-bedroom apartment, that the living room was adjoined to the two bedrooms by a short hallway, and that the hallway was approximately seven or eight feet away from where Haynes was placed under arrest in the living room. (Tr. at 18, 78.) Thus, either of the two bedrooms constitute areas adjoining the place of arrest from which an attack might have been launched. *Id.*

As the Seventh Circuit has held, "the police may walk through rooms adjacent to the one in which they make an arrest, to ensure that no danger lurks within. The officers need not demonstrate any danger; they may look simply as a precaution." *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) (citations omitted). Indeed, "[l]aw enforcement officers have an interest in ensuring their safety when they lawfully enter a house to effect an arrest. That interest justifies their ensuring that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack." *Burrows*, 48 F.3d at 1015. To be sure, the underlying rationale for the protective sweep doctrine is the principle that police officers should be able to ensure their safety when they lawfully enter a private dwelling. *United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993).

Furthermore, as the Court stated in *Buie*, officers may engage in a protective sweep beyond the immediately adjoining areas when officers have articulable facts and rational inferences that danger may lurk in the area to be swept. 494 U.S. at 334. Simply put, Milotzky and McDermott had "articulable facts which, taken together with the rational inferences from those facts . . . warrant[ed] . . . [the] officer[s] in believing that the area swept harbored an individual posing a danger to the officers or others."*Buie*, 494 U.S. at 334. Specifically, Milotzky and McDermott had information that (1) McLemore resided with Haynes in that apartment, (2) McLemore was a convicted felon, (3) McLemore was either a potential suspect in or a witness to a homicide the Milwaukee police department was investigating, (4) there was an outstanding warrant for McLemore's arrest, and (5) at approximately 11:00 p.m. McLemore's car was parked outside of the apartment building, thus raising the inference that McLemore was indeed at home when the officers arrived.

In light of the foregoing, I must conclude that the officers' decision to conduct a protective sweep was reasonable, and that the sweep was conducted in a reasonable manner. The officers, already lawfully present in the apartment, had a valid warrant for McLemore's arrest, had reason to believe that McLemore might have been in the apartment at that time, and had reason to believe that McLemore might have posed a danger to the officers. Therefore, the officers were justified in conducting a brief sweep of the apartment, lasting no longer than a few minutes and extending no more broadly than necessary to ascertain whether those suspicions were correct. In light of the policies expressed in *Buie*, the officers were entitled to ensure their own safety after entering a dwelling in which they conducted a lawful arrest and in which they suspected another individual for whom they had a valid warrant was residing. The intrusiveness of the sweep was minimal, and its

scope was limited appropriately by its purposes. Indeed, the officers did not search through drawers or dawdle in each bedroom looking for clues.

Assuming Haynes was arrested at the doorway of the apartment, the protective sweep performed by Milotzky and McDermott was still permissible under the Fourth Amendment. As the Seventh Circuit has stated, "cases that countenance protective sweeps when an arrest is made just outside the home do so on the theory that the officers are as much at risk from an unexpected assault on the defendant's doorstep as they might be inside the home." *Arch*, 7 F.3d at 1303. To be sure, an arrest made in the doorway of an apartment is "just outside the home," and in light of the "specific and articulable facts" Milotzky and McDermott had when they arrived at the apartment, I must conclude that they were "as much at risk from an unexpected assault [at the doorway to the apartment] as they might [have been] inside the [apartment]." *Id.*

Indeed, when Milotzky and McDermott arrived at the apartment and made contact with Haynes, they had information that (1) McLemore resided with Haynes in that apartment, (2) McLemore was a convicted felon, (3) McLemore was either a potential suspect in or a witness to a homicide the Milwaukee police department was investigating, (4) there was an outstanding warrant for McLemore's arrest, and (5) at approximately 11:00 at night McLemore's car was parked outside of the apartment building, thus raising the inference that McLemore was indeed at home when the officers arrived. Simply put, even if Haynes was arrested at the doorway to the apartment, I still must conclude that the officers' decision to conduct a protective sweep was reasonable, and that the sweep was conducted in a reasonable manner.

Having found that the protective sweep was lawful, the seizure of the handgun and the shoe box containing the cash, digital scale, and individual bags of cocaine was also lawful because these

13

items were in the officers' "plain view." As the Seventh Circuit has stated, an "officer need not close his eyes to what he sees during [a protective] sweep, and any contraband that he observes in plain view may lawfully be seized." *Arch*, 7 F.3d at 1303. The test for application of the "plain view" doctrine is threefold: the police must show (1) that they did not violate the Fourth Amendment in arriving at the place where the evidence was in plain view, (2) that they had a lawful right of access to the evidence itself, and (3) that the incriminating nature of the evidence is immediately apparent. *Horton v. California*, 496 U.S. 128, 136-40 (1990); *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996).

As discussed above, the protective sweep was permissible under the Fourth Amendment and thus, the first element is met. The second element of the plain view doctrine is also met because the grip of the handgun and the shoe box containing the cash, digital scale, and individual bags of suspected cocaine were in plain view, and within the scope of the protective sweep. The defendant argues that the scope of the officers' protective sweep was too broad, and that Milotzky's testimony that a person could have concealed themselves behind the bowl-shaped chair, or under the pile of laundry is implausible. (Def.'s Br. at 16.) However, I can not say that it was unreasonable for the officers to believe that a person might have been hiding behind the bowl-shaped chair or under the pile of laundry. Indeed, the defendant's argument that the officers need not look behind a chair, under a pile of laundry, or inside a closet does not comport with the underlying rationale for the protective sweep exception–that officers should be able to ensure their safety when lawfully entering a private dwelling. *Arch*, 7 F.3d at 1303. As Milotzky testified, "to just go to the door [of the bedroom] and look inside and turn around and walk away would be unsafe." (Tr. at 41.)

14

The final issue is whether the incriminating nature of the evidence was immediately apparent to the officer. To be of an incriminating nature, the items found need not be contraband or fruits of a crime. An officer only needs probable cause to believe that the item is linked to criminal activity in order for the plain view exception to the warrant requirement to apply. *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997) (citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987)). Given that the officers knew McLemore was a convicted felon and that he resided in the apartment, the incriminating nature of the grip of the handgun was immediately apparent.

As to the items discovered in the shoe box, the defendant asserts that given the location of the shoe box, the incriminating nature of its contents could not have been "immediately apparent" unless "McDermott actually picked up the shoe box 'looking for clues.'" (Def.'s Br. at 17.) I disagree. McDermott testified that when he opened the closet door, he either kicked the shoe box and then looked down, or simply looked down at some point and saw an open shoe box containing a wad of cash, a digital scale, and individual bags of suspected cocaine. (Tr. at 76.) In light of the large amount of cash contained within the shoe box, $2,880.00, the 21 individually wrapped bags of suspected cocaine, and the fact that the shoe box was open, it would be unreasonable to conclude that the incriminating nature of the contents of the shoe box was not "immediately apparent" to Officer McDermott. Consequently, the seizure of the handgun and the shoe box containing cash, a digital scale, and individual bags of suspected cocaine was constitutional, pursuant to the plain view doctrine.

Having found that the seizure of the handgun was lawful, the seizure of the plastic baggie containing numerous "gem bags," and the torn white transparent bag that contained three boxes of ammunition was also lawful because these items were also in "plain view." To reiterate, the test for

15

application of the "plain view" doctrine is threefold: the police must show (1) that they did not violate the Fourth Amendment in arriving at the place where the evidence was in plain view, (2) that they had a lawful right of access to the evidence itself, and (3) that the incriminating nature of the evidence is immediately apparent. *Horton*, 496 U.S. at 136-40.

When satisfied that the apartment was secure, Milotzky returned to the southwest bedroom to recover the handgun. Milotzky testified that the grip of the handgun was visible, but the rest of the handgun was covered by a black towel. (Tr. at 49.) When Milotzky picked up the black towel to recover the handgun, he saw a plastic baggie containing numerous "gem bags." (Tr. at 49.) Because it was constitutionally permissible for Milotzky to return to the southwest bedroom to recover the handgun, the first element of the plain view doctrine is met. The second element of the plain view doctrine is also met because the "gem bags," were in plain view, and the seizure of the handgun, which led to the seizure of the "gem bags," was within the scope of the protective sweep, thus giving Milotzky a lawful right of access to the evidence.

The final issue is whether the incriminating nature of the "gem bags" was immediately apparent. Of course, a plastic baggie containing "gem bags" is not illegal per se. The government has demonstrated, however, that the "gem bags" were of an incriminating nature. "Gem bags" are small transparent bags typically used to package narcotics, (Tr. at 49.) and immediately prior to Milotzky's discovery of the "gem bags" he learned that McDermott had discovered suspected narcotics in the southwest bedroom's closet. (Tr. at 52.) Consequently, the seizure of the plastic baggie containing numerous "gem bags" was constitutional, pursuant to the plain view doctrine.

Finally, the court will consider the seizure of the torn white transparent bag containing three boxes of ammunition. To reiterate, when satisfied that the apartment was secure, Milotzky returned

16

to the southwest bedroom to recover the handgun. While he was recovering the handgun, Milotzky saw a torn white transparent bag containing three boxes of ammunition. (Tr. at 50.) The bag was sitting on the floor within a foot or two of the handgun. (Tr. at 50.) To reiterate, because it was constitutionally permissible for Milotzky to return to the southwest bedroom to recover the handgun, the first element of the plain view doctrine is met. The second element of the plain view doctrine is also met because the torn white transparent bag containing the boxes of ammunition was in plain view, and the seizure of the handgun, which led to the seizure of the ammunition, was within the scope of the protective sweep, thus giving Milotzky a lawful right of access to the evidence.

The final issue is whether the incriminating nature of the torn white transparent bag containing the boxes of ammunition was immediately apparent to Milotzky. The defendant argues that Milotzky's testimony is implausible because "[i]t is difficult to imagine how [Milotzky] could have discerned the identity of three boxes of ammunition inside of a 'transparent white bag.'" (Def.'s Br. at 17.) However, I do not find Milotzky's testimony implausible. Milotzky testified that the torn white transparent bag was located within one or two feet from where the handgun was recovered. (Tr. at 50.) Furthermore, because the bag was *torn* and described as *transparent*, it would be unreasonable to conclude that Milotzky, an experienced police officer who was a mere foot or two away, could not have discerned that the bag contained boxes of ammunition. To be sure, the photographs of the evidence recovered in the southwest bedroom that were apparently taken, but never entered into evidence, would have greatly aided the court in this inquiry. Even so, based on Milotzky's testimony, I must conclude that the incriminating nature of the torn white transparent bag containing the boxes of ammunition was immediately apparent. Consequently, the seizure of the torn

white transparent bag containing three boxes of ammunition was constitutional, pursuant to the plain view doctrine.

In conclusion, and for all of the foregoing reasons, it will be recommended that the defendant's motion to suppress physical evidence be **DENIED**.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress physical evidence be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this  7th  day of March, 2006, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge